C. A. GALLOWAY, Appellant, v. J. W. TURNER IMPROVE-
MENT CO., Appellee.

**Master and servant:** DUTY TO WARN: USE OF TERM "WARNING." Or-
dinarily the duty of the master to warn a servant of danger re-
lates to those dangers which are not obvious and are not known
to the servant and which are or ought to be known to the master,
although the term "warning" is often used to designate signals
which are used by experienced workmen for mutual convenience
and as a part of the method of co-operation.

**Same:** SAFE PLACE TO WORK. The master's liability for failure to
furnish a reasonably safe place to work has reference to those
dangers inhering in the place, as distinguished from those arising
out of the negligence of a fellow servant.

**Same:** SAFE PLACE TO WORK: DUTY TO WARN: EVIDENCE. In this ac-
tion for injury to a servant while employed about a machine
used in digging a sewer, it is held that the defendant did not
owe plaintiff, an experienced workman, the duty of warning him
that the engineer in charge of the machine might negligently
start the same without giving a signal; as the possibility of his
thus starting the machine was as evident to the plaintiff as to the
defendant.

*Appeal from Polk District Court.*—HON. HUGH BRENNAN,
Judge.

THURSDAY, JUNE 16, 1910.

ACTION for personal injuries. At the close of plain-
tiff's evidence the court directed a verdict for the defend-
ant, and entered judgment against the plaintiff for costs.
Plaintiff appeals.—*Affirmed.*

*Edgar T. Fee* and *Van Vleck & Holmes,* for appel-
lant.

*Hewitt, Miller & Wallingford,* for appellee.

EVANS, J.—The defendant's motion for a directed verdict in the court below was based upon several grounds, and was sustained generally. The question, however, which has received the principal discussion on this appeal, and to which we shall give principal attention, is whether the negligence disclosed by the evidence · on the part of the plaintiff was masterial or was that only of a fellow workman. We adopt the following statement of facts from appellant's argument:

At the time of the injury herein complained of, March 27, 1908, plaintiff was in the employ of defendant company, and as such was known and scheduled as a 'timberman.' Defendant company was engaged in digging ditches for the purpose of laying sewer pipe. In the conduct and operation of said business of digging a sewer ditch, defendant company · used a large and complicated machine known and designated as a 'sewer digger' (a full description may be found in the testimony of A. A. Bonifield, Abstract, pages 14, 15). Said machine was operated by a twenty horse-power boiler and a twenty-six or twenty-eight horse-power engine which furnished the motive power therefor. It was the duty of plaintiff under his employment by defendant company to curb the ditch behind the machine by dropping planks or boards down edgewise into the ditch, pressing them against the banks and placing crosstimbers, jacks or stringers to keep the planks in place. The ditch varied in depth from nine to ten feet below the surface ground. It was also the duty of plaintiff under his employment by defendant company to shave down the sides of the bank, dig at the bottom of the trench, and shovel the loose dirt into the buckets of the digger. Such work became necessary by reason of the fact that the digging machine in starting from the surface of the ground or in turning an angle would not reach back and cut the bank in a perpendicular line. At the time of the injury, defendant company was engaged in digging a ditch and turning the corner at Thirty-Ninth and Ingersoll Avenue, Des Moines, Iowa. The sewer ditch at

this point varied in depth from four to ten feet on an incline plane. The distance from the foot of the digger at the bottom of the ditch to the foot of the incline plane was about two feet, and varied in distance as the incline plane of the ditch and the line from the foot of the digger to the surface of the ground. At the time of the injury in question, plaintiff in the performance of his duties as directed by defendant company, was at the bottom of said ditch shaving off the banks and shoveling the dirt into the buckets or scoops of the machine. He was spading about fifteen inches in width and keeping it down with the machine. From where the plaintiff was working in the ditch to the place where the engine was situated on the tracks in front of the ditch was from fifteen to twenty feet. The day was cold and windy. The machinery had been at a standstill for some considerable time. The engineer who operated the machinery had been off the machine and down in the ditch with plaintiff immediately before the machine was started in motion causing the injury to plaintiff. At the time of injury plaintiff was busily engaged in the performance of his duty and had no knowledge that the engineer had left the ditch and gone back to the engine. The evidence shows that the boiler and engine were not equipped with a whistle or any appliance for giving warning signals upon the stopping or starting of said machinery. The evidence further shows that there was a custom among all the employees to give a signal upon the starting or stopping of the said machinery. The custom, in substance, was that, when the machinery was at a standstill, and the employees working in the ditch, for the engineer before starting the machinery to shout or call to the men below some form of words of warning, or if the employees were ready to have the machinery started the warning would be called or shouted by the employee or employees in the ditch below to the man in charge of the machinery above. This custom had existed among the men for a long period of time, and had become well established and understood among the employees. Such direction had been positively given by the foreman in charge of the work to the various employees. Such custom had long been within the knowledge and observed by plaintiff. The evidence

also shows that the engineer had full knowledge of such custom, and had observed the same for a considerable time prior to the injury in question. At the time the injury in question occurred plaintiff as we have heretofore said was engaged in the performance of his duties at the bottom of the ditch and by reason of the small space within which to work, of necessity was in close proximity to the scoops or shovels of the digger, and, fully relying upon the custom long existing of giving warning before starting the machinery, had no reason to apprehend that it would be suddenly started without such warning having first been given. The undisputed evidence shows that without warning of any kind whatsoever said machinery was started in motion suddenly, resulting in the injuries complained of in plaintiff's petition. The uncontradicted evidence shows that plaintiff at said time gave no warning nor had he theretofore given any warning to start said machinery at the time it was set in motion. The evidence also shows that plaintiff had no knowledge or warning of any kind that said machinery was to be or was about to be set in motion.

Additional facts may be noted in the further discuscussion of the case.

In his original substituted petition, the plaintiff specified and classified the alleged negligence of the defendant as follows:

(1) That the defendant company was negligent in employing an incompetent, careless, unskilled, reckless and inefficient person to operate and manage said engine and machinery attached thereto. (2) That the defendant company was negligent in retaining in its employ an incompetent, careless, unskilled, reckless and inefficient person to operate and manage said engine and machinery attached thereto, after knowledge of such incompetency, carelessness, unskillfulness, recklessness and inefficiency of such persons. (3) That the defendant company was negligent in not supplying or equipping its engine or boiler with a suitable steam whistle, and in not directing its engineer to use the same by giving warning blasts to warn its other employees engaged in the performance of their duties and especially

this plaintiff in the trench.   (4) That the defendant company was negligent in not providing a person and assigning him to stand on the surface of the ground in such a position as that he might and could see the engineer at his post of duty and the plaintiff in the performance of his duty in the trench, and warn the plaintiff of the purpose of the engineer to stop or start his engine and machinery attached thereto in motion.   (5) That defendant company was negligent in not making and promulgating suitable and needful rules and regulations for the safe and proper manner in which said engine and machinery thereto attached should be operated by its employees and for the proper conduct of its employees, in carrying on defendant's business.   (6) That the defendant company was negligent in not providing a safe place for plaintiff to work, in not providing suitable machinery with which to work, in not providing sufficient coemployees to assist plaintiff, and in not employing safe and competent coemployees with which to work.

Later, he filed the following amendment:

That it was the custom and duty of the defendant company before the starting of said engine and machinery thereto attached to give warning by crying out or shouting certain words of warning so that workmen working in the trench in the vicinity of said machine could retire to some safe place, and that plaintiff relying upon said custom of defendant company, and without warning by the defendant, and without fault on plaintiff's part, was injured as heretofore stated.   And that because of the negligence and failure of the defendant company as above stated, plaintiff, at the time of the starting of the engine and the machinery thereto attached in motion from which he received his said injuries, had no knowledge or notice of the fact that said engine and machinery thereto attached were about to be started in motion while he was engaged in the discharge of the duties then assigned to him as heretofore stated, and while he was so working in close proximity to said machine; and that plaintiff relied upon the custom and obligation of said defendant company as above stated, and not otherwise, and his

injuries were the direct and proximate result of negligence of said defendant company in the matters and omissions heretofore stated.

. Under the evidence the plaintiff must prevail, if at all, on the form of alleged negligence specified in the above amendment, and his argument here is directed to that view. The argument of the plaintiff here purports to be based upon the elementary propositions that the master owes to the servant a duty to warn and the duty to furnish him a safe place to work. The sum' of the argument is that the plaintiff's place of work was rendered unsafe by the act of the engineer in starting the machinery without first giving to the plaintiff the customary warning or waiting for such warning to be given by some one else. The engineer was one Webster. It is not denied that Webster was a fellow servant of the plaintiff so far as the performance of his ordinary duties as engineer is concerned. It is claimed, however, that the duty to give a signal or warning to the plaintiff before starting the machinery was a nondelegable, masterial duty, and that failure to give it was a failure of the master in the performance of its duty, regardless of the agency to which its performance was intrusted.

Some confusion has crept into the argument, we think, through the use of the term "warning," as descriptive of the customary starting signal usually given by the engineer. The masterial duty to warn a servant has its

1. MASTER AND SERVANT: duty to warn: use of term "warning."

well defined limitations as a general proposition of law. Ordinarily it relates only to those nonobvious dangers which are not known to the servant, and which are known or ought to be known to the master. It has its most frequent application in favor of the newly employed or inexperienced servant. In common parlance, the terms "warn" and "warning" have a much broader application, and they are often used as designating the cries and signals which are

used by experienced workmen for mutual convenience and protection and as a part of the method of cooperation. And in this sense have these terms been used in this discussion; and there is a tendency in the argument to assume that the masterial duty to warn is as broad and comprehensive as the common parlance of these terms.

And so it may be said that the liability of the master for failure to furnish to the servant a reasonably safe place

2. SAME: safe place to work.

to work has reference to those dangers which inhere in the place as distinguished from those dangers which arise in a place merely as the result of the negligence of a fellow servant. Keeping these elementary distinctions in mind, we may proceed to an analysis of the case.

Plaintiff places special reliance upon the case of *Hendrickson v. Gypsum Co.*, 133 Iowa, 89. It is argued that the reasoning in that case is conclusive, and this as in favor of the plaintiff. If this contention is logical, then we have obliterated the fellow-servant rule without intending to do so in our holding in that case. The underlying thought of the opinion in that case was that the method of use of high explosives about that mine rendered the whole place unsafe, and that it left no means to the workmen to protect themselves while remaining in their place of work. And that therefore the master had no right to convert the place of the workmen into a place of danger by such use of high explosives in blasting except as he assumed the duty precedent to give notice of the proposed explosion so that the workmen could withdraw from the place of danger so created. This is only another way of saying that the right of the master to use high explosives in such a way as to render the places of the workmen dangerous is conditioned upon a previous notice or warning for the purpose of enabling them to withdraw. In case of an explosion, the place of the workmen became unsafe, not through the negligence of any fellow servant,

but in accord with the very plan of the master. It was held in effect, therefore, that the duty to warn the workmen to leave their places was inseparable from the right to such use of high explosives. The *Hendrickson* case was deemed to be a border line case and one presenting unusual difficulties in its solution. The reasoning of the opinion was close, and its distinctions were necessarily somewhat fine. It was not regarded as overturning any of the well-established rules of the liability of the master to the servant. But it was deemed to present a situation which called for the application of these rules in a somewhat exceptional way.

Turning to the case before us, the plaintiff's place of work was in a ditch behind the machinery. The place presented no inherent danger even when the machinery was in operation. The starting of the machinery did not require the plaintiff to leave his place or his work as a means of safety. If he had received a warning notice from the engineer, he would not have left his work, nor his place of work. His injury resulted, not because of any particular danger inhering in his place of work, but because at the time the machinery started, he stood with one foot in or over the bucket of the machine. Whether that was a negligent act on his part is one of the questions which we will not discuss now. On the contrary, we will assume that it was not negligent, as a matter of law at least. This position of his foot was rendered possible by reason of his proximity to the machinery, but it was in no sense a necessity of his situation nor an incidental sequence thereof. It was simply one of those details of method of doing his work which he himself adopted. By all of the authorities, such details are beyond the foresight and control of the master. Assuming that the plaintiff was not negligent in so placing his foot, we should further assume that Webster was negligent in starting the machine without

3. SAME: safe place to work: duty to warn: evidence.

giving the signal which would doubtless have resulted in the plaintiff's removing his foot from the bucket. It seems clear to us, therefore, that plaintiff's place of work was not unsafe within the meaning of the law. The danger encountered by the plaintiff at the particular moment did not arise *out* of the place. The most that can be said is that it arose *in* the place, but out of the negligence of Webster. If we were to hold that every place of a workman where injury results to him through the negligence of another is rendered thereby an unsafe place, we should leave no defense to a blameless master against liability for the wrongs of fellow servants. We reach the conclusion that the plaintiff's evidence disclosed no violation of the masterial duty to furnish a reasonably safe place to work.

Turning, now, to the other specifications of alleged negligence in the failure of Webster to warn the plaintiff that he was about to start the machine, was Webster in such failure of duty at that point acting as a vice principal? It is not claimed that Webster was not a fellow servant so far as his general duties of work were concerned, both as engineer and while working in the ditch with the plaintiff. It is argued, however, that in so far as he was under duty to warn the plaintiff, he was carrying a masterial duty and was therefore a vice principal. To put it another way, what duty of warning did the master owe to the plaintiff? As already indicated, it owed him the duty of warning against such dangers as were unknown to him and were known or ought to be known to the master. The plaintiff was experienced in his work, having been engaged in it for nearly four years. Webster had been his fellow servant for the last two years of that time. Surely the master owed him no duty of warning against the danger of putting his foot in the bucket. The possible danger involved in such an act was as obvious to the plaintiff as it could be to the master. The master did not owe plaintiff the duty to warn him

that Webster *might* through negligence start the machine without a signal. This possibility was as manifest to the plaintiff as it could be to the master. It was also a changing detail of the progressing work, for which the master has always been held not responsible.

This brings us to an analysis of the real negligence which resulted in plaintiff's injury. Did this negligence consist in the failure of the master to warn the plaintiff that Webster was going to start the machine, or did it consist in the negligence of Webster in starting the machine before giving a signal to the plaintiff and without waiting for one to be given by anybody? If it be said that the negligence consisted in the master's breach of duty to warn the plaintiff against a danger known to the master and unknown to the plaintiff, what was the danger that was known to the master? Can it be said that the master must be deemed to know not only that Webster *might* start up the machine without signal, but also that he *would* do so? If the master did not know or have reason to know that Webster would so start the machine, then there was no duty to warn imposed upon it. The only possible answer to this position is that the master must be deemed to know what Webster must know, and that Webster knew that he was about to start up the machine, and that no signal had been given, and that such knowledge of Webster was the knowledge of the master. This argument can be tenable only on the theory that Webster was a vice principal, not simply in relation to the duty to warn, but in his capacity as an engineer. It can not be claimed otherwise than that, in his capacity as engineer, Webster was a fellow servant, and that if he prematurely started the machine it was necessarily the negligence of a fellow servant which could not have been foreseen or warned against by the master as such. It may be noted here that the six specifications of the original substituted petition which we have set forth all disappear by force of

plaintiff's own evidence, and the plaintiff has rested his case upon the theory which we have now been discussing. The sum of the situation is that under the evidence offered by plaintiff, the master had furnished a safe place to work, and had furnished proper machinery appliances, and experienced and competent fellow servants, and had promulgated suitable methods and rules of operation. The prosecution of the work and the adaptation of themselves to its changing details, and cooperation with each other, and the exercise of care for the mutual safety of each, were all duties which devolved upon the servants, and for the breach of which redress can be had against the offending party alone. Our conclusion is that the trial court properly directed the verdict. A reverse conclusion would quite destroy the fellow-servant rule and overturn the overwhelming weight of authority. For authorities in support of the conclusions here announced, see: *Wellihan v. National Wheel Co.,* 128 Mich. 1 (87 N. W. 75); *Bergstrom v. Staples,* 82 Mich. 654 (46 N. W. 1035); *Porter v. Silver Creek Co.,* 84 Wis. 418 (54 N. W. 1019); *Quigley v. Levering,* 167 N. Y. 58 (60 N. E. 276, 54 L. R. A. 62); *Herman v. Port B. M. Co.* (D. C.) 71 (Fed. 853); *Martin v. Atchison R. R. Co.,* 166 U. S. 399 (17 Sup. Ct. 603, 41 L. Ed. 1051); *Portance v. Lehigh Co.,* 101 Wis. 574 (77 N. W. 878, 70 Am. St. Rep. 932); Labatt on Master and Servant, vol. 2, sections 580, 601, 607-609.

The following cases from other jurisdictions are cited by appellant's counsel as tending to support their contention: *Belleville Stone Co. v. Mooney,* 60 N. J. Law, 323 (38 Atl. 835); *Hjelm v. Western Granite Construction Co.,* 94 Minn. 169 (102 N. W. 384); *Comrade v. Atlas Lumber Co.,* 44 Wash. 470 (87 Pac. 517).

The order of the trial court will be *affirmed.*