JOHN SCHERER, Appellee, v. ALFALFA MEAL CO., Appellant.

**Master and servant:** NEGLIGENCE OF FELLOW SERVANT: EVIDENCE.
1  Where an employee, having charge of the operation of a machine, started the same without warning to another employee of the danger to which he had voluntarily exposed himself, his act in so doing was not chargeable to the master, on the theory that he was a vice-principal for such purpose, but was the act of a fellow servant in the ordinary operation of the work, for whose negligence the master was not liable.

**Same:** NEGLIGENCE: WARNING: DUTY OF MASTER. The duty of the
2  master to warn a servant ordinarily exists with respect to those dangers which are not obvious, are unknown to the servant, and which are or should be known to the master, and is most frequently applied in favor of newly employed and inexperienced workmen. The warning exacted of the master has reference to such dangers as inhere in the place or machinery provided for the servant, and not those dangers arising as the result of the negligence of a fellow servant, and has no reference to the signals or cries of experienced workmen for their mutual protection.

*Appeal from Pottawattamie District Court.*—HON. W. R. GREEN, Judge.

SATURDAY, APRIL 12, 1913.

THIS is an action for personal injuries resulting to the plaintiff by the starting of a feed cutter, without warning to him, while his hand was exposed to danger from the revolving knives. The defense was a general denial and a plea of contributory negligence, and a further plea that if there was any negligence other than that of the plaintiff it was that of a fellow servant. There was a trial to a jury and a verdict for plaintiff. Judgment was rendered thereon, and defendant appeals.—*Reversed.*

*Saunders & Stuart* and *M. A. Hall,* for appellant.

*Thomas Q. Harrison,* for appellee.

EVANS, J.—The following descriptive statement from appellant's argument is conceded by appellee to be substantially correct:

The plaintiff was, during the years 1907-08, operating a mill in the city of Council Bluffs for the manufacture of alfalfa meal. Among other buildings, it occupied a large brick building and also, immediately to the north, a frame structure, in which was placed the ensilage cutter, which will be hereafter called the 'feed cutter.' A large double door led from the brick structure into the cutting room, and the feed cutter stood about twenty-five feet northeast of this double door. From ten to twenty feet south of the double door an elevator shaft came down from the floor above, and on one side of this shaft a ladder also came down from the second story of the brick building. The feed cutter was used to cut the alfalfa hay into small particles. The hay came to the machine in bales, and two men were required to operate it— one to cut the wires; the other to feed the loose hay into the machine.

The feed cutter stood east and west. In the east end of the cutter there was a set of revolving knives. These were bolted to a shaft, and on the end of the shaft, about six inches from the machine, was a wide pulley over which ran a belt several inches in width. This set of knives revolved at high speed and received the power from the belt. The pulley was on the south side of the machine and was about three feet from the floor. When the machine was in operation, the knives were covered by a cast-iron hood, which served the double purpose of covering the knives and keeping the cut hay from blowing all over the room. Immediately west of the knives was a cutter bar set about a sixteenth of an inch from the knives. This bar was held in place by bolts that passed through the frame of the machine. The bolts were upon the outside of the machine, and the nuts upon them were turned from the outside. The hood or cover was hinged, and could be turned back to the west for the purpose of working with the knives, but had

to be closed when the machine was in operation. About twenty feet east of the cutter was a partition and behind this were two motors; the larger being used for the purpose of operating a belt which ran to a pulley in the cutting room. From the shaft operated by this pulley the belt operating the cutter ran to the pulley upon the cutter. The cutter was started and stopped by operating a lever in the motor room, which cut off the electric current. There was a door leading from the cutter room into the motor room. From the position where one operated the lever he could see a person standing on the south side of the cutter, but could not see a person standing at the east end of the machine on the north side of the belt. Immediately north of the cutting knives, but lower down, was a blower which received and blew the cut feed up to the second story of the building through a spout or pipe. The cutter was so placed that one could not get at the east end of the machine except by stooping and passing under the belt that operated the cutter. When one was standing at the east end of the machine and facing the cutting knives, he could see to his left, at a distance of not more than six or eight inches from the machine, the pulley over which was transmitted the power that turned the knives. At one time there had been a loose pulley to which the belt in times past had been shifted when the machine was not running. This loose pulley, however, on account of the danger caused by the belt jumping from the loose pulley to the working pulley, had been removed months prior to the time of the accident, and this fact was known to the plaintiff at the time he was injured.

Two persons were necessary for the operation of the machine, the wire cutter, who did nothing but cut the wire bound about the bales of alfalfa, and the man who fed the loose alfalfa into the machine. The man who fed the machine also stopped and started the same, and, as between the two at the machine, had charge of its immediate operation, though he was not a foreman in the factory.

The cutter had been fed for some six months prior to the accident by one Mason. Mason stopped and started it. 'During the time I was feeding the machine, if it had to be stopped, I stopped it, and if it stopped it was my business to start it.' The plaintiff said 'he [the feeder] was the man who started the machine; the man cutting the wires did all the oiling.' All parties agree that the feeder stopped and started the ma-

chine, and that the plaintiff had worked more or less about the machine, at one time more than a month. And it was admitted of record by him on the trial that he was perfectly familiar with the cutting machine and the conditions there in the cutting room.

At the time of the accident of which plaintiff complains, Mason and Clark were working in the cutting room at the feed cutter. They were the only employees of the company then working in that room. Hearing a noise in the machinery of the room, they stopped the motor which operated the feed cutter, and Mason secured some grease in a grease cup and placed it on a shaft which he thought was running dry. Clark, who was cutting bands, said he thought the noise came from the fan; but Mason insisted it had come from the shaft, and told Clark to listen while he started up the motor to ascertain if the noise came from the fan. Clark stationed himself on the south side of the machine and stood there facing west. Mason went into the motor room to the place where the lever was which started the motor.

Scherer, the plaintiff, had been working upstairs, and after this machinery stopped he came down the ladder at the side of the elevator shaft into the room immediately south of the cutting room. He then passed through the door between these two rooms into the room in which this machine was and went to the machine, passing Clark and going behind him, crawling under the belt which operated the cutter and taking a position at the east end of the cutter facing west toward the cutter, with the belt at his left hand and the blower at his right. Scherer's testimony was that as he passed Clark he asked where Mason was, and Clark said he did not know; also that the cover over the cutting knives was raised at the time he came into the room. This is directly denied, but must be taken as true for the purpose of this argument. According to Scherer's testimony he put his hand into the cutter among the knives, and, the machine starting to move, his hand was cut before he could withdraw it. He was deeply cut about the base of the thumb, but made a normal recovery, and there was no permanent injury to his hand.

There is no syllable of testimony anywhere in the record that Mason knew Scherer was about the machine or anywhere in the room when he started the motor. It is conceded by all that Mason was not in the room when Scherer entered, or at any time thereafter until after the accident.

There is no testimony in the record anywhere that Mason was in any sense a foreman. As between the two men working at the machine, the man who was for the time being the feeder started and stopped the motor. The other man, or band cutter, attended to the oiling.

Scherer was working in another part and department of the factory. He claimed that he, in common with the other employees, had general orders that when there was a failure or stoppage of the machinery they should assist in repairing it. He also claimed that he put his hand in among the knives to feel if the cutter bar was loose, which was unnecessary, as the cutter bar is bolted on the outside; but there is no claim that he reported to any one or asked or received any instructions from any one in reference to this machine.

The appellee contends that the jury would have been justified, under the evidence, in finding the facts as follows:

The defendant is a corporation. That on or about the 17th day of March, 1908, it was operating a mill for grinding alfalfa, and that plaintiff was employed by defendant as an employee in said mill. That Mr. Brooks was the manager of the defendant at the time of the accident. That the machinery in that mill frequently got out of repair, so that the mill had to shut down and cease operations until it was fixed. That plaintiff was tactful in its repair. That Mr. Brooks, the manager, gave orders to plaintiff for him to fix up all machinery as quickly as possible, so that there might be no delay. That Mr. Berkshire, at the time of the accident foreman of the men, told this plaintiff lots of times to fix that cutter. The ensilage cutter stopped and was out of repair repeatedly. The cutter frequently broke down, and if there was any trouble with the bar in the ensilage cutter it was necessary to put one's hand in to ascertain what the matter was. One could not tell from the outside, only from the noise, what was the trouble with the ensilage cutter until you put your hand in to feel of the bar. The ensilage cutter was operated by a motor run by electricity, which was separated from the ensilage cutter by a closed partition, and was in another room from the ensilage cutter. The motor running this ensilage cutter was started up by operating a small lever in connection with the motor, which was forty or fifty feet from the ensilage cutter. The order from Mr. Brooks, the

manager of the defendant, with which this plaintiff was familiar, was that, before the machinery in said mill should be started up, a signal should be given, and the lid or hood covering the ensilage cutter should be closed down. Mr. Berkshire had charge of the entire mill, as foreman, at the same time Mr. Brooks was the manager of it. Mr. Berkshire gave instructions to one and all of the men that at any time when the machinery was closed down, and the power was shut off, never to start until the cover or hood of the ensilage cutter was closed over the knives, and to ascertain before they started the motor whether there was any one near that might be in danger of getting hurt.

On the day of the injury the mill stopped running. There was trouble with the machinery. This plaintiff, thinking something was the matter with the cutter bar from the noise he heard from the top of the place, went down from the second floor, where he was working, to see what was the trouble with the machinery. He came to the ensilage cutter, where he thought the trouble was. The lid was open, thrown folded back over the knives, when he got there; the knives were then exposed. Plaintiff did not open the machinery and throw back the hood. Mason was doing the feeding of the machine, and it was his duty to start it if there was not any one else to start it. Mr. Berkshire generally helped start the machine going, or Mr. Kissel. On the day that Scherer was hurt Mr. Berkshire was in the north part of the building when the machine stopped and at the time Scherer got hurt, and Kissel was on the top of the roof patching holes in the roof. Plaintiff upon his arrival at the ensilage cutter, reached his hand in to see if the cutting bar was loose or broken, and just as he got his hand in the knives started revolving. He was looking right into the machine when he put his hand in there. This service was rendered in compliance with the order from both Mr. Brooks and Mr. Berkshire that, in case the machinery, and especially this ensilage cutter, broke down, he should go ahead and repair it as soon as possible, and not wait for the machinist, and with the knowledge of the rule that the motor should never be started with the cutter lid open, nor until the person who was to start the machine took observation and said 'Hello.' When plaintiff came to the ensilage cutter, the man Mason, whose duty it was to operate it, was not there; nor was there any one in charge of it for the purpose of operating it. Mason had gone into another

room, separate and apart from that containing the ensilage cutter, in which the motor was, for the purpose, he says, of correcting what seemed to him to be the trouble with the machinery, and while Scherer was thus examining the ensilage cutter the man Mason, without signal or notice of examination to see whether any one was near or about the cutter machine and in danger of being hurt, set in motion the electric motor that operated the ensilage cutter, thereby setting in motion the ensilage cutter itself, and this plaintiff's injury was caused thereby.

At the close of all the evidence the defendant moved for a directed verdict on the various grounds indicated in its answer. This motion was overruled, and the case was submitted to the jury, as already indicated.

It will be noted from what is above set forth that the appellee's contention of fact is that Mason was negligent in failing to warn the plaintiff that he was about to start the machine. His contention of law is that the

1. MASTER AND SERVANT: negligence of fellow-servant: evidence.

duty to warn was the master's duty, and that therefore Mason became a vice principal for such purpose as a matter of law, even though he was not such as a matter of fact in any other respect or for any other purpose. For the soundness of his position the appellee relies upon *Hendrickson v. Gypsum Co.*, 133 Iowa, 89. This was a case involving the use of high explosives, and is not applicable to the case at bar. The present case falls squarely within the class of such cases as *Galloway v. Turner*, 148 Iowa, 93; *Helgeson v. Higley Co.*, 148 Iowa, 587; *Peterson v. Railway Co.*, 149 Iowa, 496. These cases control the case at bar at every point.

It will serve no useful purpose to repeat the discussion The distinction between the nature of the duty to warn which

2. SAME: negligence: warning: duty of master.

is incumbent upon the master, and the particular duty which is involved in the case at bar is pointed out in the *Galloway* case, *supra*. The following quotation from the opinion in such case is applicable:

Some confusion has crept into the argument, we think, through the use of the term 'warning,' as descriptive of the customary starting signal usually given by the engineer. The masterial duty to warn a servant has its well-defined limitations as a general proposition of law. Ordinarily it relates only to those nonobvious dangers which are not known to the servant, and which are known or ought to be known to the master. It has its most frequent application in favor of the newly employed or inexperienced servant. In common parlance, the terms 'warn' and 'warning' have a much broader application, and they are often used as designating the cries and signals which are used by experienced workmen for mutual convenience and protection and as a part of their method of co-operation. And in this sense have these terms been used in this discussion, and there is a tendency in the argument to assume that the masterial duty to warn is as broad and comprehensive as the common parlance of these terms. And so it may be said that the liability of the master for failure to furnish to the servant a reasonably safe place to work has reference to those dangers which inhere in the place, as distinguished from those dangers which arise in a place as the result of negligence of a fellow servant. Keeping these elementary distinctions in mind, we may proceed to an analysis of the case.

The same opinion distinguishes the case from those cases involving the use of high explosives, as follows:

Plaintiff places special reliance upon the case of *Hendrickson v. Gypsum Co.*, 133 Iowa, 89. It is argued that the reasoning in that case is conclusive, and this as in favor of the plaintiff. If this contention is logical, then we have obliterated the fellow servant rule without intending to do so in our holding in that case. The underlying thought of the opinion in that case was that the method of use of high explosives about that mine rendered the whole place unsafe, and that it left no means to the workmen to protect themselves while remaining in their place of work; and that therefore the master had no right to convert the place of the workmen into a place of danger by such use of high explosives in blasting, except as he assumed the duty precedent to give notice of the proposed explosion, so that the workmen

could withdraw from the place of danger so created. This is only another way of saying that the right of the master to use high explosives in such a way as to render the places of the workmen dangerous is conditioned upon a previous notice or warning, for the purpose of enabling them to withdraw. In case of an explosion the place of the workmen became unsafe, not through the negligence of any fellow servant, but in accord with the very plan of the master. It was held in effect, therefore, that the duty to warn the workmen to leave their places was inseparable from the right to such use of high explosives.

The distinction between such as the case at bar and the cases involving the use of high explosives is also set forth in the *Helgeson* case, *supra.* In the *Helgeson* case an elevator was started without warning through the negligence of a fellow servant. The following excerpt from the opinion is peculiarly applicable to the present case:

He was under like, but no greater, duty to give warning, and his failure to give it can no more be charged to defendant than if some other employee had been guilty of the same neglect. His failure to do so was simply his own negligence, for which, under well-settled rules of law, defendant is not responsible. It is not a case where defendant furnished an unsafe place to work. The place was safe, and only became unsafe when an employee with proper instructions failed to give warning, and did not then become unsafe to every one in the building, but only to one who was about to use the elevator. It differs materially from mining cases, where high explosives are used which make the place unsafe to all who may be in the mine unless warning is actually given. . . . Should we hold the master liable for failure to give warning in this case, nothing would remain of the well-established rule often announced by this court that for the negligence of a fellow servant the master is not liable. Here we must assume there was no defect in the elevator, no lack of a proper number of efficient servants, no failure to promulgate proper rules, no negligence in failing to instruct the plaintiff as to dangers, no failure to provide a reasonably safe place to work and sufficient appliances.

The foregoing is decisive of the case before us. We see no escape from the conclusion that the defendant was entitled to a directed verdict.

The judgment of the lower court must therefore be *Reversed*.