JAMES GARREN, Appellee, v. OTTUMWA GAS COMPANY, Appellant.

MASTER AND SERVANT: Hidden and Lurking Dangers. The "safe-place-to-work" rule is violated by the failure of the master to warn his servant of a lurking and hidden danger, *which is not ordinarily incident to the carrying on of the work*, of which danger the master had knowledge, and of which danger the servant did not have knowledge.

PRINCIPLE APPLIED: A metal boiler or "tar head," 3 feet in diameter and 10 feet high, in which tar was melted, rested on a cement foundation, and extended upward through the room and into the room above. The top of the boiler was bell-shaped, into which a lid was fastened by simply calking it. A steam pipe, connected with a distant boiler, entered the top of the tar head. A faucet, through which tar was drawn, was located at the bottom of the boiler. When steam was turned in at the top to melt the tar, danger of explosion existed, unless a vent valve, also located at the top, was opened. An employee, who had never before worked around the boiler, and who had no knowledge of its construction, except what he could see while working in the lower room, was directed to draw tar therefrom. Without the knowledge of the employee, steam was turned into the boiler by the superintendent of the works, without opening the safety vent. The servant had no warning of the danger of explosion. The boiler exploded, and the employee was injured.

*Held*, the master violated his duty in not warning the servant.

TRIAL: Excessive Verdict—$5,000. Verdict of $5,000 for personal injuries sustained, as nonexcessive.

*Appeal from Wapello District Court.*—C. W. VERMILION, Judge.

JANUARY 17, 1919.

REHEARING DENIED APRIL 14, 1919.

ACTION for damages for alleged negligence. There was a verdict and judgment for plaintiff, and the defendant appeals.—*Affirmed.*

*McNett & McNett,* for appellant.

*L. L. Duke* and *W. S. Asbury,* for appellee.

PRESTON, J.—1. Plaintiff alleges, substantially, that, on November 17, 1913, he was an employee of defendant's, engaged as a laborer in digging ditches and doing work out-

1. MASTER AND SERVANT: hidden and lurking dangers.

side of defendant's plant; that, in. the manufacture of gas, defendant used a metallic boiler, or tar receptacle, about 10 feet long and 3 feet in diameter, sitting upon end upon a cement foundation about 3 feet high; that the top on said boiler or tar tank was merely a lid, calked around the edges, with no rivets to hold the same on, and that said tar head was not securely fastened to the foundation; that a few inches from the top of said boiler was a steam inlet, and near the bottom on the side was a faucet outlet in said boiler, for the purpose of letting tar out of it; that said steam inlet came from a large steam boiler, carrying a high pressure; and that steam was so conveyed to the tar boiler for the purpose of warming the tar to such a degree that the tar would run out of the lower inlet or faucet; that, about said date, plaintiff was directed by his foreman to take a wheelbarrow and catch tar that was to be run out of said tar boiler; and that he obeyed said instructions; that plaintiff had never before worked around said tar boiler, and did not, at the time, know that it was connected with the large

steam boiler, nor did he know of the nature of the construc-
tion of the tar boiler; that he placed a wheelbarrow under
the faucet in said tar boiler; that one Weisengerber, the
superintendent over said gas plant, ordered that more steam
be turned into said tar boiler; and that, a few minutes after
said order, an explosion occurred, which blew the top off
the tar boiler, the entire tar boiler falling off its foundation,
causing the steam and hot tar from said boiler to come in
contact with plaintiff's face and body and into his eyes;
that, as a result thereof, plaintiff's eyes have been affected in
such a way that he has, ever since said explosion, been com-
pelled to wear glasses; that his eyes continually water and
annoy him; that the lights hurt him; that the nerves in his
left eye and back of his head continually give him pain; that
he cannot sleep, from the effect upon his nervous system;
and that said injuries to his eyes are permanent.

The grounds of negligence alleged are: (1) That de-
fendant did not furnish plaintiff a reasonably safe place to
work, in that the top of said tar head was insecurely fasten-
ed, and said tar head insecurely fastened to the foundation;
(2) in connecting said tar boiler with such a large steam
pressure boiler; (3) in ordering plaintiff to work in a dan-
gerous place without warning plaintiff of the danger, when
it knew that plaintiff was not acquainted with the part of
the plant where he was ordered to go; (4) in turning on, or
ordering to be turned on, such a high pressure of steam upon
such a small tar boiler without warning plaintiff of the dan-
ger; (5) that defendant did not warn plaintiff of the dan-
ger arising from the fact that a vent pipe in the top of the
tar head was closed at the time he was ordered to take tar
therefrom; (6) in failing to open said vent in said tar head
before said explosion.

Defendant answered in general denial, and expressly
denied there was any negligence connected with the con-
struction, kind, or condition of said tar head or boiler, or

that there was any defect therein, or that the alleged explosion and damage were caused or contributed to thereby; in a like manner denies that there was any negligence in connecting said tar head with the steam boiler; denies that plaintiff was ordered into a dangerous place, or that his injury, if any, was caused or contributed to thereby; denies that the explosion and damage occurred by reason of any alleged negligence connected with or pertaining to the kind, character, or condition of defendant's machinery or equipment, as alleged; says further that whatever negligence, if any, caused said explosion was that of a fellow servant of plaintiff's, the said Weisengerber, for whose acts or negligence, if any, defendant is not responsible.

There was a motion for a directed verdict for defendant at the close of all the evidence, which was overruled.

The trial court instructed, among other things:

"4.    There is no sufficient evidence to warrant a finding that there was any negligence in the construction of the tar head, or the manner in which it was set, or in the manner in which the top was fastened on, or in the connection or manner of its connection to the steam boiler, and hence, all such charges of negligence are withdrawn from your consideration.

"5.    While it is the duty and obligation of a master to furnish a servant with a safe place to work, and with safe appliances, yet, where an accident happens from carelessness in their use, or the failure to use them on the part of a servant, whereby injuries are received by a fellow servant in the same common employment, such carelessness or negligence is not chargeable to the master, no difference what may be the grade or authority of the servant.

"6.    And the mere failure, if any, on the part of an employee of the defendant, engaged with plaintiff in the common enterprise of removing the tar from said tar head, to open the steam vent pipe on said tar head, would be the

act of a fellow servant, for which the defendant would not be liable, and hence that charge of negligence is withdrawn from your consideration.

"7.   The burden of proof in this case is upon the plaintiff, and before he can recover, he must establish by the greater weight or preponderance of the evidence each and all of the following propositions:

"First.   That the defendant was guilty of negligence in ordering plaintiff to work in a dangerous place, and in failing to warn him of the danger arising from the fact that the vent pipe of the tar head was closed.

"Second.   That such negligence was the proximate cause of the injury to plaintiff.

"Third.   That the plaintiff was not himself guilty of any negligence that in any manner contributed to his injury.

"8.   There is a duty on the part of a master to exercise ordinary care to provide his servants a reasonably safe place in which to work, but that principle is not applicable to a case where the place becomes dangerous in the progress of the work, either necessarily or from the manner in which the work is done.   But if the master had knowledge of, or by the exercise of ordinary care on his part he ought to have known of, an unusual, new, and latent danger, not incident to the ordinary manner of doing the work, and which the master knows, or by the exercise of ordinary care ought to know, the employee is ignorant of, and does not appreciate, then it is his duty to warn the employee thereof.

"9.   If defendant's superintendent, in charge of the operation of said gas plant and said tar head, knew, or by the exercise of ordinary care and diligence on his part ought to have known, that steam was turned into said tar head, while the steam vent thereon remained closed, and that thereby there arose the danger that said tar head might explode or burst, and that such danger was a new, unusual,

and latent danger, and one not incident to the ordinary operation of said tar head, and knew that plaintiff was working in a place of danger from such cause, and was aware, or in the exercise of ordinary care ought to have been aware, that plaintiff was ignorant of and did not appreciate such danger, then it was his duty to warn plaintiff thereof; and if he failed to do so, this would be negligence on defendant's part.

"10. If you find, by the greater weight or preponderance of the evidence, that the plaintiff was directed by the defendant's superintendent to work about the tar head in question, by wheeling the tar away therefrom, and that the fact that he was so engaged was known to the person or persons in charge of the operation of said plant, and that the steam was turned into said tar head without opening the steam vent, and thereby the plaintiff was subjected to an unusual danger, and one not ordinarily incident to the work in which he was engaged, and of which he was ignorant, and that such facts were known to the person or persons in charge of and directing the operation of said gas plant and said tar head, or by the exercise of ordinary care and diligence ought to have been so known by them, or one of them, and such person or persons gave plaintiff no warning of such danger, this would be negligence chargeable to the defendant company. But if you fail to so find, you need go no further, but should return your verdict for the defendant.

"13. If you find the defendant guilty of negligence in failing to warn the plaintiff of danger arising from a failure to open said steam vent, and that such negligence was the proximate cause of the injury to plaintiff, and that the plaintiff was free from contributory negligence, then your verdict should be for the plaintiff; but if you fail to so find, your verdict should be for the defendant."

The defendant offered instructions, some of which were

embodied in the instructions given by the court; but on the question of warning, defendant's offered instructions, which were refused, were to the effect that such charge of negligence is not supported by the evidence, and withdrawing that ground, and another as follows:

"6. The plaintiff, in his amendment to his petition, and as a ground of negligence, alleges: 'That the defendant was negligent in not furnishing the plaintiff a safe place in which to work, in that it did not warn the plaintiff of the danger of the fact that a vent pipe in the top of the tar head, or tar receptacle, was closed at the time he was ordered to take tar from said tar head.' You are instructed that the failure to open, if such is the fact, the vent pipe at the top of the tar head, was the act or omission of a fellow servant of the plaintiff, for whose act or omission or negligence the plaintiff is not entitled to recover."

A cut of the tar head and its parts is here set out, in order that there may be a better understanding of the evidence, and to save more particular descriptions thereof.

The issue as to negligence is narrowed,—and, as we understand it, it is so conceded by counsel for appellant, and by counsel for appellee, so far as defendant's appeal is concerned,—to the question as to whether defendant was negligent in ordering plaintiff to work in a dangerous place, and in failing to warn him of the danger arising from the fact that the vent pipe of the tar head was closed.

The record is quite voluminous, and we shall attempt to confine the evidence, as much as may be, to that issue. There is evidence that, on the date in question, plaintiff was directed to remove some tar from the tar head, which was located in and was a part of the gasworks. He had theretofore been employed on outside work, in the capacity of digging ditches and performing manual labor outside the plant; he had never at any time performed the work of removing this tar, and had no knowledge of how such work

should be performed, or the danger attached to it; he did not know the construction of the tar head, and did not know that it was connected with a steam plant, and liable to explode. He was directed to do the work of carrying away the tar from the tar head by Mr. Tunwall, who was one of defendant's superintendents, and with power to employ and discharge help. Tunwall was under Weisengerber, who had

like authority as to employment and discharge of men; they were in charge of the work, and were present on the second floor, where the benches and top of the tar head were, and within a few feet from plaintiff, at the time the explosion occurred. Plaintiff was then at work at the outlet valve at the bottom of the tar head where it rested upon its foundation. There is evidence that one or the other of these men either turned on the steam or directed it to be done. Tunwall testifies that he did not do so, and that he did not see who turned it on. Appellant concedes that, though the proof is not entirely positive, yet, taking the evidence all together, it was sufficient to justify the jury in finding that Weisengerber did turn on the steam into the tar head, and failed to open the steam vent, which resulted in the explosion. Appellee contends that they were both vice-principals. Weisengerber did none of the manual labor, but directed others what to do and when to do it, and directed Tunwall, as well as the others. There is evidence that the steam pipe leading into the tar head and the relief valve were situated at a point above the second floor, and not subject to observation from the point where plaintiff was standing with his wheelbarrow, preparatory to doing the work which he had been directed to do. The top of the tar head was bell-shaped, for a plug to sit in. The steam was conveyed to the tar head for the purpose of warming the tar so that it would run out of the lower inlet. Though there is no direct evidence on the point, appellee argues that the purpose of turning the steam on without opening the vent pipe was to more quickly heat the tar, so that it would run. Plaintiff had never done any of this tar work before; he was scooping the tar out of the box into the wheelbarrow and hauling it out, and had hauled two barrow loads, and had been at that work about an hour before the explosion. Plaintiff had never been on the second floor and examined the part of the tar head and its attachments which were above the second floor; did not

know that the steam was connected with the tar head. It appears that Tunwall and Weisengerber were in a position where they could easily have determined whether or not the vent was open. Tunwall says he presumed that it was open, but that it was no part of his duty to see that it was; he made no effort to find out whether it was open. He says that Weisengerber was at the head of this and was supposed to take care of that, and that no one, so far as he knew, made any effort to find out whether it was open. Weisengerber was not a witness. Tunwall testifies that he knows of no one except Weisengerber who could have turned the steam on, or who opened or failed to open the vent. Another witness testifies that Tunwall, Weisengerber, and his assistant went upstairs together, and were there at the time of the explosion, and that the steam commenced coming into the tar head after they went upstairs. There is testimony that, about fifteen minutes before the explosion, Weisengerber wanted to know of Tunwall if the steam was melting the tar, and he said it did not seem as though it was melting very fast. He said, "Well, we will put on a little more steam," and Tunwall said: "No, sir, I think it has enough steam. We don't need any more in there. That is all it will stand." It is conceded by appellant in argument that, without dispute, the evidence shows that the cause of the explosion was the turning of steam into the tar head without at the same time opening the vent pipe, and that the steam pressure forced off the top of the tar head, tipping it over. No warning was given plaintiff that the steam was to be turned into the tar head in the manner in which it was turned in. Appellee's contention is that the explosion was a terrific one. It appears that, after the explosion, the tar head leaned on its foundation over against the wall; one pipe was blown over to the coal car from which they had been shoveling coal, close to 24 feet; this pipe was a 6-inch pipe, 4 to 6 feet long; the 6-inch valve attached to shut the tar

off from the hydraulic main was blown to the top of the roof, and stuck there. The roof was 20 feet or more above the tar head. Immediately after the explosion the room was filled with steam. The steam boiler was 125 or 150 horse power, 16 feet long, by 6 feet, encased in brick. It ordinarily carries a pressure of about 100 pounds. The machinery in the plant was operated by means of this boiler. The tar head was broken loose from the steam pipe. The tar head was also held in place by a 6-inch pipe that came out of the hydraulic main and fastened on the tar head, and a 2-inch water pipe, and a 3-quarter-inch steam pipe. The tar head broke loose from both of those. Tar was scattered all over the floor, according to some of the testimony, and scattered on the wall. Tar was sprinkled all over plaintiff's clothes, both his hands and face. There was lots of steam in the room immediately after the explosion, and before the steam was cut off. Other workmen were working in the building, one man working with plaintiff at the same work, until a minute or two before the explosion. The stoker was working about 25 feet distant; others were working on the second floor. Such, in a general way, is a brief statement of the evidence bearing upon the questions presented.

As said, the controlling feature in the case, so far as any right of recovery is concerned, is whether, under the evidence, any duty rested upon the defendant to warn the plaintiff. This question was submitted to the jury, under the instructions before set out. The trial court seems to have taken the view, and so instructed, that, so far as the other grounds of negligence alleged were concerned, and the mere act of turning on the steam without opening the vent, such acts were the acts of a fellow servant; but that, because of the latent danger not incident to the ordinary manner of doing the work, known to defendant, and unknown to plaintiff, should the jury so find, then there was a duty resting upon the defendant to warn, and such duty was masterial

and nondelegable. It is not so clear, from a reading of the instructions, that the court intended to instruct that, as to the duty to warn, Weisengerber was a fellow servant, but rather, it refers to him as the defendant's superintendent in charge of the plant and tar head. Appellee contends that, under the circumstances, there was a duty resting upon the defendant to warn plaintiff, and that, therefore, it is not material whether Weisengerber and Tunwall were fellow servants or vice-principals. It is doubtless true that the tar head, operated as it was, with the steam turned on and the vent closed, might have been operated for a longer or shorter time without exploding, or it might not have exploded at all. As we read the evidence, it does not show that an explosion would necessarily follow. An explosion was more likely if the vent was closed, with the steam turned on. Operated in that manner, it was more dangerous. The jury was justified in finding that this fact was known, or should have been known, to the defendant, and that plaintiff did not have such knowledge. It seems to us quite clear that the tar head, operated in that manner, made the place an unsafe one for plaintiff to work. Appellant argues that, had plaintiff been warned that the steam was about to be turned on without opening the vent, and that there would be danger from confinement of the steam, and that an explosion might take place, it would have had the effect only of causing plaintiff to run out of the building, to escape possible and threatened danger; or, had he stayed at work after the warning, and been hurt, he would have been guilty of contributory negligence. This seems to be the theory of the high explosive cases: that, where a powder blast or the like is about to be exploded, and where it is known that an explosion will take place, the warning in such case gives employees an opportunity to get out of the way. Such cases are not precisely in point perhaps, but are somewhat analogous. The place in which plaintiff was working did not become unsafe during

the progress of the work, nor was he helping to create the unsafe conditions, in the sense that a workman would in digging under a bank of earth, or a coal miner of an entry being driven, and the like, so that the place became dangerous during the progress of the work, either necessarily or from the manner in which the work is done. The reference by the court to this matter was in connection with the proposition in regard to an unsafe, new, and latent danger, not incident to the ordinary manner of doing the work. That part of the instruction in regard to danger from the progress of the work may not, as before indicated, be strictly applicable to the evidence, but it was favorable to the defendant, and, therefore, not prejudicial. Appellant cites and relies upon *Galloway v. J. W. Turner Imp. Co.*, 148 Iowa 93; *Helgeson v. E. B. Higley Co.*, 148 Iowa 587; *Scherer v. Alfalfa Meal Co.*, 159 Iowa 683; *Fredericks v. Fort Dodge B. & T. Co.*, 151 Iowa 637; and cases from other jurisdictions, to the proposition that the doctrine of warning is not applicable to the instant case, and that the charge of negligence, based upon the failure to warn, should not have been submitted to the jury, and that the doctrine of warning should not have been submitted. Appellant also argues that the facts which warranted the application of the doctrine of warning in the case of *Hendrickson v. United States Gypsum Co.*, 133 Iowa 89, and like cases, where high explosives are used, and where the duty to warn is held to be material, are so essentially dissimilar to and unlike the facts of the instant case as not to make the doctrine of the *Hendrickson* case applicable to the case at bar (citing again the four cases last cited, and *Peterson v. Chicago, R. I. & P. R. Co.*, 149 Iowa 496, and *Manton v. H. L. Stevens & Co.*, 170 Iowa 495). Counsel quotes quite extensively, from the *Galloway* case, which discusses and distinguishes the *Hendrickson* case. Counsel, in argument, select and italicize certain parts of the discussion in the opinion in the *Galloway* case, and thus

seek to apply the principles laid down therein to the instant
case.    We think the *Galloway* case may be readily distin-
guished, because of its facts, from the instant case.    Some
of the distinctions will be noticed.    First, it was said in the
*Galloway* case that:

"The underlying thought of the opinion in that [*Hen-
drickson*] case was that the method of use of high explosives
about that mine rendered the whole place unsafe, and that
it left no means to the workmen to protect themselves while
remaining in their place of work, and that, therefore, the
master had no right to convert the place of the workmen
into a place of danger, by such use of high explosives in
blasting, except as he assumed the duty precedent, to give
notice of the proposed explosion, so that the workmen could
withdraw from the place of danger so created."

The opinion continues that, in such a case, the use of
high explosives is conditioned upon the previous notice or
warning for the purpose of enabling the workmen to with-
draw.    In the instant case, no means were left to plaintiff
to protect himself while remaining in his place of work; and
defendant, in the instant case, concedes, as before stated,
that the only thing plaintiff could have done, had he been
warned, would have been to withdraw.    There is this sim-
ilarity, too, between the instant case and the *Hendrickson*
case, that the whole place was made unsafe, at least to those
working in the vicinity where plaintiff was working.    The
*Hendrickson* case is, of course, stronger in its facts than the
instant case; for there high explosives were used, and it was
the purpose to explode a charge.    It was said in the *Gal-
loway* case, at page 101, that defendant owed plaintiff the
duty of warning against such dangers as were unknown to
him, and were known, or should be known, to the master.
It was further said in the *Galloway* case that plaintiff was
experienced in his work, having been engaged in it for near-
ly four years, and that his place of work was in a ditch, be-

hind the machinery; that the place presented no inherent
danger, even when the machinery was in operation; that
the starting of the machinery did not require the plaintiff to
leave his place or his work, as a means of safety; that his
injury resulted, not because of any particular danger in-
herent in his place of work, but because, at the time the
machinery started, he stood with one foot in or over the
bucket of the machine,—it was simply one of those details
of method of doing his work which he himself adopted, and,
by all of the authorities, such details are beyond the fore-
sight and control of the master; that, because of these facts,
the plaintiff's place of work was not unsafe, within the
meaning of the law; that the master did not owe the plain-
tiff the duty of warning against the danger of putting his
foot in the bucket; that this was as obvious to the plaintiff
as it could be to the master, and a possibility that Gallo-
way's fellow servant, Webster, might negligently start the
machine without a signal was as manifest to the plaintiff
as it could be to the master; and that it was also a changing
detail of the progress of the work. Summing up the matter,
the court said that, under the evidence, the master had fur-
nished a safe place to work, and had furnished proper ma-
chinery appliances and experienced and competent fellow
servants, and had promulgated suitable methods and rules
of operation. In the instant case, there was inherent dan-
ger when the machinery was in operation, in the manner in
which it was operated; plaintiff's position and work were
not one of those details of method adopted by himself; plain-
tiff was inexperienced in the work he was engaged in at the
time he was injured; and the danger of operating the ma-
chinery with the steam turned on and the vent closed was
not as obvious to him as to the defendant; nor do we think
it can be said that it was a changing detail of the progress-
ing work. Other distinguishing facts between the *Galloway*
and the instant case might be given, but with what has been

said, it is sufficient to say that the principles therein stated do not apply. In the instant case, plaintiff's danger did not arise solely from turning the steam on with the vent closed, but also from the operation of the tar head in that manner without informing him of the danger. In the *Scherer* case, plaintiff was injured by the starting of a feed cutter, without warning to him, while his hand was exposed to danger from the revolving knife, and it was held that the case was ruled by the *Galloway, Helgeson,* and *Peterson* cases. In the *Scherer* case, plaintiff was examining an ensilage cutter, and a fellow servant, without signal, set the motor in motion that operated the cutter, causing plaintiff's injury. The case discusses the *Helgeson* case, where the plaintiff was under like, but no greater, duty to give warning, and it was said that it was not a case where defendant furnished an unsafe place to work. The place became unsafe only when an employee, with proper instructions, failed to give warning; and the place did not then become unsafe to everyone in the building, but only to one who was about to use the elevator, in which respect it was pointed out that there was a difference in such a case, from mining cases, where high explosives were used, which makes the place unsafe to' all. There was but little discussion of that case, other than to quote from the *Galloway* and other cases, and the statement that the case was ruled by those cases. In the *Fredericks* case, at page 642, the principle was recognized that it was plainly the duty of the master to warn his employees of new and latent dangers, and that this duty cannot be delegated to another, in such a manner as to relieve the master from the results of nonperformance (citing *Schminkey v. T. M. Sinclair & Co.,* 137 Iowa 130, 133). The *Fredericks* case also quotes from *Hardy v. Chicago, R. I. & P. R. Co.,* 149 Iowa 41, 45, 46, saying that the effect of the order was to require plaintiff to work in a situation exposed to a peril not theretofore encountered, nor, in so far as ap-

pears, contemplated. Not every direction with reference to
the progress of the work, even when given by a superior serv-
ant, is to be regarded as coming from the master, as appears
from the authorities relied upon by appellant; but where
the effect of the peremptory order of a person in complete
control is to place the employee in a place of great peril in
which to perform his duties, the decisions are conclusive that
the principal will be held responsible for the act as non-
delegable (citing a number of cases). The *Fredericks* case
was decided and reversed on the ground that the defendant
had assigned a man to the duty of warning those shoveling
in the pit from any danger from falling or protruding pieces
of clay, and the holding was (Mr. Justice Weaver dissent-
ing) that what the person who was assigned to warn the oth-
ers did, was connected with, and quite as essential to carry
on the work, as was that of shoveling. The court said that,
because all were engaged in the common enterprise of re-
moving the clay, there was no difference in principle between
that case and other cases holding that one who is working
in a gravel pit or in a trench, assumes the risk of the falling
of material which is loosened and comes down as the result
of the ordinary operation of excavating, and that it was not
the duty of the employer, having half a dozen men at work
in a clay pit, to continue his supervision over them, with
reference to the ordinary operation of bringing down and
loading the clay. So it might be said of the instant case,
in so far as it involved the ordinary operation of plaintiff,
in drawing off and hauling away the tar. The cases cited
by appellant, before referred to, are, in some respects, ex-
ceptional cases, and because of their facts, are distinguish-
able from the instant case. Appellee's proposition is that
a failure of the employer to warn an employee of latent
dangers known by the employer, or dangers that would have
been known by the employer by the exercise of ordinary care,
and which are not obvious and not known by the employee,

renders the master liable to a servant who has not been warned. In support of this proposition, they cite *Vohs v. A. E. Shorthill & Co.*, 130 Iowa 538; *Klaffke v. Bettendorf Axle Co.*, 125 Iowa 223; *Meier v. Way, Johnson, Lee & Co.*, 136 Iowa 302; *Long v. Johnson County Tel. Co.*, 134 Iowa 336; *Collingwood v. Illinois & I. F. Co.*, 125 Iowa 537; *Murray v. Chicago, R. I. & P. R. Co.*, 152 Iowa 732; *Spencer v. Updike Co.*, 158 Iowa 31; *Kerker v. Bettendorf M. W. Co.*, 140 Iowa 209; *Hamm v. Bettendorf Axle Co.*, 147 Iowa 681, 690; *Aga v. Harbach*, 140 Iowa 606, 611; *Anderson v. Pittsburgh Coal Co.*, 108 Minn. 455 (26 L. R. A. [N. S.] 624, Note 633); *Christian v. City of Ames*, 167 Iowa 468; *Beresford v. American Coal Co.*, 124 Iowa 34. See, also, *Hitchcock v. Arctic Creamery Co.*, 170 Iowa 352, 376.

We shall not review these cases. Some of them are cases where there was a failure to warn an inexperienced servant, and perhaps some where the employee was immature. Some of the cases seem to be quite in point: among them, the *Hitchcock, Klaffke,* and *Hamm* cases, and perhaps some of the others. The instructions in the instant case were in harmony therewith, and we are of the opinion that there was no error in regard thereto, or in overruling the motion to direct a verdict, and for new trial based thereon.

2. Appellant contends that plaintiff's injuries were not as serious as he claimed, and that he was malingering. Some of defendant's witnesses so testified, but they qualified their testimony somewhat, upon cross-examination. There were a number of witnesses, both medical and lay, testifying both pro and con upon this subject. If the jury believed the plaintiff's witnesses, as they had a right to do, they were justified in finding that the plaintiff was seriously and permanently injured in his eyes, or one of them in particular, the sight of which was substantially destroyed. The eyes are watery and inflamed, and are affected by light. No

2. TRIAL: ex-cessive verdict: $5,000.

useful purpose would be served in setting out the evidence. The jury returned a verdict for $8,750. The motion for new trial was sustained unless plaintiff would remit all above $5,000. The remittitur was filed, and judgment rendered for the last-named amount. Appellant contends that the judgment is still excessive; but we are not disposed to interfere.

3. Plaintiff has appealed from the action of the trial court in withdrawing from the jury certain of the allegations of negligence, but states that he waives his appeal if there is an affirmance of the case on defendant's appeal. No error appearing, the judgment is—*Affirmed*.

WEAVER, EVANS, GAYNOR, and STEVENS, JJ., concur.